AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

VIRGIL BUCHANAN,

Defendant

**LODGED**
CLERK, U.S. DISTRICT COURT

**8/26/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

Case No.   2:24-MJ-05143-DUTY

**FILED**
CLERK, U.S. DISTRICT COURT

**8/26/24**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MR _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 3, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1344(2) | Bank Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Lauren Ireland*
*Complainant's signature*

_____
Lauren Ireland, Postal Inspector
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   August 26, 2024

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kenneth R. Carbajal, x3172

## AFFIDAVIT

I, Lauren Ireland, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.  I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since July 2023. I completed a 16-week basic training course in Potomac, Maryland, which included training in mail theft investigations.  I am currently assigned to the Los Angeles Division, Long Beach Mail Theft and Violent Crimes Team ("Mail Theft Team"). My responsibilities include the investigation of crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of the United States mail ("U.S. mail"), possession of stolen U.S. mail, and crimes related to the use, theft or counterfeiting of USPS keys and locks.  I also investigate crimes in connection with access devices that include credit cards and debit cards, identity theft, and the unauthorized use of other persons' information for financial gain, as these criminal schemes often are perpetrated through the U.S. mail.

2.  I have specialized training and experience in postal-related crimes and criminal investigations, specifically including mail theft, mail fraud, bank fraud, counterfeit and real stolen USPS keys, and identity theft.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.  This affidavit is made in support of a criminal complaint and arrest warrant against Virgil BUCHANAN ("BUCHANAN") for a violation of Title 18, United States Code, Section 1344(2) (Bank Fraud).

4.  This affidavit is also made in support of an application for warrants to search the following:

a.  6701 Eton Avenue, Apartment 515, Canoga Park, CA 91303 (the **"SUBJECT PREMISES"**), as described more fully in Attachment A-1;

b.  The person of BUCHANAN, as described more fully in Attachment A-2; and

c.  A black Audi Q7 bearing California paper plate CG41H43 and/or Vehicle Identification Number ("VIN") "WA1LXAF77MD013503" (the **"SUBJECT VEHICLE"**), as described more fully in Attachment A-3.

5.  The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 (Conspiracy), 1028A(a)(1) (Aggravated Identity Theft), 1029(a) (Fraud and Related Activity in Connection with Access Devices), 1344 and 1349 (Bank Fraud and Attempted Bank Fraud), and 2315 (Sale of Stolen Goods) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, A-3 and B are incorporated herein by reference.

6.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

2

information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.  Homeland Security Investigations ("HSI") El Camino Real Financial Crimes Task Force ("ECR") has identified BUCHANAN, who resides in the city of Canoga Park, as the main suspect of a scheme targeting affluent communities to steal victim credit cards issued in their names to fraudulently purchase high-priced items at high-end retail stores in Beverly Hills and Los Angeles, California.

8.  On December 3, 2023, BUCHANAN utilized a credit card belonging to D.W. to conduct multiple fraudulent purchases at high-end retail stores located in Beverly Hills, California.

9.  BUCHANAN provided the **SUBJECT PREMISES** as his home address to VCSO officers as early as August 3, 2023 and continues to live there.

10. Law enforcement officers saw BUCHANAN driving the **SUBJECT VEHICLE** and park it at the **SUBJECT PREMISES.**

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    BUCHANAN Burglarizes D.O.'s Vehicle on July 2, 2023, and Uses Victim D.O.'s Stolen Credit Cards to Make Fraudulent Purchases**

11. Based on my review of law enforcement reports, financial documents, surveillance video footage, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

a.    According to a law enforcement interview with victim D.O., on or about July 2, 2023, D.O. and his/her family visited the North Ranch Country Club (the "Country Club") at approximately 10:00 a.m.  They parked in the Country Club parking lot, left their wallet inside a bag within the back seat of the vehicle, and locked the vehicle before leaving. Sometime later, D.O.'s family member returned to the vehicle to retrieve a personal item and then left the vehicle.  D.O. and his/her family all returned to their vehicle about one and a half hours later.

b.    Shortly after driving away from the Country Club, D.O. opened his/her bag and found credit cards and other various cards in different locations than usual.  D.O. realized two of his/her credit cards were missing, a Citibank credit card ending in 9427 (the "9427 card") and an American Express credit card ending in 5012 (the "5012 card").

c.    Later that day, D.O. and his/her spouse contacted the Ventura County Sheriff's Office ("VCSO") to file a police report and sent VCSO detectives a video taken by a recording device installed on the outside of their vehicle.  The video

showed a gray 4-door Maserati drive past D.O.'s vehicle and through the Country Club parking lot.

        d.    D.O.'s spouse called the credit card companies associated with D.O.'s stolen credit cards and learned that the credit card companies had recently denied the following three transactions attempted on D.O.'s stolen credit cards, which had been attempted on July 2, 2023, at the Neiman Marcus Beverly Hills, in the following amounts:

        i.    One attempted charge at approximately 12:30 p.m. for $8,409.59 on D.O.'s Citibank card.

        ii.    Two attempted charges for $8,409.59 and $4,577.09 on D.O.'s American Express card, occurring at approximately 12:30 p.m. and at 12:38 p.m., respectively.

        e.    On or about July 2, 2023, D.O. reported the theft to the Country Club personnel.  The Director of Facilities at the club, B.M., stated he reviewed video surveillance footage at the club and at approximately 10:07 a.m., observed a suspect, later identified by VCSO as BUCHANAN, driving onto the Country Club premises in a gray Maserati (the "Maserati") and the suspect entering other vehicles parked at the Country Club.[1] According to the Director of Facilities, at approximately 10:09 AM, the suspect entered D.O.'s vehicle.  VCSO detectives reviewed the footage and observed the suspect rummaging through D.O.'s bag and throughout the vehicle. The suspect drove out of the Country Club parking lot in the Maserati at approximately

---

[1] Law enforcement later identified the Maserati to be white but wrapped in a gray vinyl type of material.

10:28 a.m.  The Director of Facilities provided D.O. still photographs from the video footage, which showed the suspect walking within the parking lot, and included a photograph of the Maserati.  The surveillance footage also showed the Maserati had California license plate number 9FMG991, which was registered to BUCHANAN.

 

**B.    Neiman Marcus Loss Prevention Recognizes the Suspect, BUCHANAN, as the Individual in the Store During the Fraudulent Transactions on July 2, 2023**

12. Based on my review of law enforcement reports, surveillance video footage, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

a.    On or about July 27, 2023, VCSO detectives contacted the Neiman Marcus Beverly Hills Loss Prevention Officer, D.D., who said that he recognized the suspect from numerous regular visits to the store. He then checked the past video surveillance footage and found the suspect was inside the store on July 2, 2023, during the time the fraudulent transactions on victim D.O.'s credit cards occurred. D.D.

confirmed the three attempted fraudulent transactions using D.O.'s credit cards were conducted within the Christian Dior boutique. VCSO detectives reviewed the store's video surveillance footage and determined that the suspect in the Neiman Marcus Beverly Hills surveillance resembled the suspect from the Country Club video.

b.    VCSO conducted a law enforcement search accessing license plate reader cameras and found the Maserati at the following locations on the following dates and times:

i.    On July 2, 2023, at 9:14 a.m., on eastbound Calabasas Road at Parkway Calabasas, in the city of Calabasas. This location is approximately 14 miles away from the Country Club where the suspect was seen on surveillance footage about an hour later that day.

ii.    On July 2, 2023, at 3:22 p.m., on northbound Rodeo Drive at Brighton Way, in the city of Beverly Hills.  This location is approximately 0.3 miles away from the Neiman Marcus Beverly Hills store where D.O.'s credit cards were used just a few hours prior that day.

**C.    BUCHANAN Returns to the Country Club on July 8, 2023**

13. Based on my review of law enforcement reports, financial documents, body worn camera footage, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

a.    On or about July 8, 2023, at approximately 9:45 a.m., the Director of Facilities at the County Club called VCSO and reported the same suspect involved in the theft that

7

occurred on July 2, 2023, had returned to the Country Club driving the Maserati. VCSO Deputy Oneill conducted a traffic stop on the vehicle at Westlake Boulevard and Thousand Oaks Boulevard to positively identify the driver of the Maserati as the suspect from the Neiman Marcus Beverly Hills surveillance and the Country Club surveillance.

      b.   VCSO detectives reviewed Deputy Oneill's body camera video and found BUCHANAN resembled the suspect, had a similar body type, had the same style beard, and had the same clothing accessories as the suspect in the still images from the Country Club surveillance footage on July 2, 2023. BUCHANAN was also wearing the same style sunglasses and baseball hat during the traffic stop as in the surveillance video at the Country Club. VCSO detectives compared images provided by Neiman Marcus Beverly Hills loss prevention officer to the traffic stop body-worn camera video footage and believe BUCHANAN was wearing the same white T-shirt, dark pants, glasses, and watch in the Neiman Marcus video as he wore at the Country Club.

      c.   During the traffic stop, Deputy Oneill asked BUCHANAN for his current phone number and BUCHANAN provided the deputy with a phone number ending in 9890 (the "9890 Number").

    **D.   VCSO Seizes Watch, Receipts, Credit Cards Not in BUCHANAN's name, and Black iPhone from BUCHANAN's Person after Arresting BUCHANAN for Identity Theft, Felony Grand Theft, and Related Charges**

   14. Based on my review of law enforcement reports, photographs, surveillance video footage, body worn camera footage, conversations with other law enforcement agents, and

my own knowledge of the investigation, I am aware of the following:

a. On or August 3, 2023, VCSO detectives responded to Neiman Marcus Beverly Hills. While there, the VCSO detectives learned that BUCHANAN had also entered the Neiman Marcus store on the same day and was attempting to make a purchase at the Christian Dior boutique. VCSO detectives located the Maserati parked nearby. VCSO detectives then arrested BUCHANAN on state charges of felony identity theft, obtain credit with other's identification, and felony grand theft, sell, transfer, or convey access card. VCSO Detective Richter conducted a search of BUCHANAN's person incident to arrest. During the search, the following items were found on BUCHANAN's person:

i. A black iPhone with clear phone case (the "black iPhone") (as noted below, this iPhone shared the same number as the number provided to the VCSO deputy during the traffic stop on July 8, 2023);

ii. A California driver's license in the name of Virgil Jamal BUCHANAN;

iii. A Mastercard ending in 2699 (the "2699 card") that did not belong to BUCHANAN and listed the name S.W. on the 2699 card;

iv. A Capitol One credit card ending in 5364 (the "5364 card") that did not belong to BUCHANAN and listed the name W.W. on the 5364 card;

> v.    A Neiman Marcus Beverly Hills receipt for a Christian Dior boutique purchase made on the same day of the arrest for "leather goods" totaling $4,818.  The receipt listed S.W. as the purchaser and the 2699 card as the purchasing card;

> vi.  Ten $100 bills; and

> vii. One Audemars Piguet Royal Oak silver watch.

b.    The watch resembled the silver watch the suspect was wearing at the Country Club in the video taken on July 2, 2023, and the silver watch that BUCHANAN was wearing in the body worn camera video during the traffic stop conducted on July 8, 2023. BUCHANAN was subsequently charged by VCSO for violations of California Penal Code Section 530.5(a) (Unauthorized use of personal identifying information) and was released on bail on or about August 25, 2023.

**E.    HSI initiates an Investigation into the Unauthorized Use of a Stolen AMEX card at High-End Retail Stores**

15. Based on my review of law enforcement reports, photographs, surveillance video footage, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

a.    On or about December 14, 2023, Homeland Security Investigations ("HSI") El Camino Real Financial Crimes Task Force ("ECR") Special Agents were contacted by American Express ("AMEX") bank investigator P.G. regarding the fraudulent use of an AMEX credit card ending in 9005 (the "9005 card") issued in the name of D.W.  Based on records received from AMEX, this credit card was fraudulently used to conduct the following

transactions on the following dates and locations without D.W.'s authorization:

i.    On December 3, 2023, three transactions were conducted at the Neiman Marcus Beverly Hills totaling $50,287.94.

ii.    On December 3, 2023, two transactions were conducted at the Saks Fifth Avenue 603 located on 9600 Wilshire Boulevard, Beverly Hills, California 90212, totaling $21,858.91.

iii. On December 3, 2023, one transaction was conducted at the Louis Vuitton 36 located on 295 N Rodeo Drive Beverly Hills, California 90210, for $10,544.85. I observed surveillance footage from the Louis Vuitton department store which showed BUCHANAN make the fraudulent transaction.

iv.    On December 3, 2023, one transaction was conducted at the Cartier 370 located on 295 N Rodeo Drive Beverly Hills, California 90210, for $56,556.76.

v.    On December 4, 2023, two transactions were attempted but ultimately denied by AMEX at the Neiman Marcus Beverly Hills, totaling $19,885.20.

b.    The fraudulent transactions using the 9005 card totaled $159,133.66, including attempted charges.

F.    **HSI Interviews Victim D.W. on January 9, 2024**

16. Based on my review of law enforcement reports, photographs, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

c.   On January 9, 2024, HSI Special Agents conducted an interview of victim D.W. who stated that on or about December 3, 2023, he/she left his/her wallet inside his/her vehicle which contained approximately $3,000 in U.S. currency and his/her credit cards.  After D.W. returned to his/her residence, D.W. began to receive notifications on his/her phone regarding fraudulent charges being made to the 9005 card.  D.W. opened his/her wallet and discovered that the 9005 card was missing and replaced with a similar looking card in the name of victim "P.J.B / B.H. LLC".  D.W. stated that the cash from the wallet was also stolen.

d.   HSI Special agents and victim D.W. reviewed his/her American Express statement from December 2023 and D.W. highlighted seven fraudulent charges he/she did not authorize. These seven charges totaled approximately $139,248.46.

e.   D.W. stated he/she does not know anyone by the name BUCHANAN that he/she did not authorize BUCHANAN to use his/her credit card.

f.   HSI Special Agents showed D.W. multiple photographs of BUCHANAN and a co-conspirator in various stores in Southern California as well as their California Department of Motor Vehicle photographs.  D.W. did not recognize BUCHANAN or the co-conspirator in any of the pictures.

**G.   HSI Interviews Victim S.P. on January 16, 2024**

17. Based on my review of law enforcement reports, photographs, conversations with other law enforcement agents,

and my own knowledge of the investigation, I am aware of the following:

      a.   On January 16, 2024, HSI Special Agents conducted an interview of victim S.P., who stated that on or about July 7, 2023, S.P. went to dinner at the Nobu Restaurant in Malibu, California and parked his/her vehicle with valet and left his/her wallet inside the vehicle. On or about July 8, 2023, S.P. received text messages on his/her phone about charges on his/her credit card, but he/she ignored the messages. On the same day, July 8, 2023, S.P. received a phone call from American Express to approve a charge, and that is when S.P. realized his/her credit cards were stolen. S.P stated his/her AMEX credit card was swapped out for a black card but could not recall the name of on the card. S.P. handed the black card found in his/her wallet to AMEX fraud investigators. S.P. told investigators that two cards were stolen from his/her wallet, but only one was replaced with another card that did not belong to S.P.

      b.   HSI Special Agents and victim S.P. reviewed his/her American Express statement from July 2023 and S.P. highlighted six fraudulent charges he/she did not authorize. Those six charges totaled approximately $89,203.05.

      c.   S.P. stated he/she does not know anyone by the name BUCHANAN and did not authorize BUCHANAN to use his/her credit card.

      d.   HSI Special Agents showed S.P. multiple photographs of BUCHANAN and a co-conspirator in various stores

13

in Southern California as well as their California Department of
Motor Vehicle photographs. S.P. did not recognize BUCHANAN or
the co-conspirator in any of the pictures.

### H. The Black iPhone Seized from BUCHANAN Shared the Same Number as Previously Provided by BUCHANAN

18. Based on my review of law enforcement reports,
photographs, conversations with other law enforcement agents,
and my own knowledge of the investigation, I am aware of the
following:

a.    Pursuant to a federal search warrant issued on
April 15, 2024, by the Honorable Rozella A. Oliver, U.S.
Magistrate Judge, in Case No. 2:24-mj-2210, HSI Agents conducted
an examination of the black iPhone found in BUCHANAN's
possession during his arrest on August 3, 2023. During the
examination of the black iPhone, HSI agents discovered that the
black iPhone's associated telephone number was the same as the
phone number BUCHANAN provided to the VCSO deputy during the
traffic stop on July 8, 2023.

b.    During the examination of the black iPhone, HSI
agents discovered several photographs of items linked to victim
S.P., such as a credit card in the name of S.P. and a photograph
of a white Tesla with an identifiable license plate in the black
iPhone.  A query of DMV records identified the 2022 white Tesla
as registered to S.P.  The metadata information retrieved from
the photograph states the picture was taken on July 8, 2023, at
approximately 3:59:22 p.m.  HSI agents found a photograph of an
individual that appeared to be S.P. on the black iPhone.

c.    During the examination of the black iPhone, photographs were found of three credit cards with names other than BUCHANAN, over 25 receipts from luxury retail stores and 14 receipts with names not belonging to BUCHANAN.

**I.    HSI Interviews Victim S.W. on August 16, 2024**

19. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

a.    On August 16, 2024, HSI SAs conducted an interview of victim S.W., who stated that he/she does own the 2699 card but he/she had given it to his/her daughter W.W. to use. Victim S.W. does not allow anyone else to use the 2699 card.

b.    SAs and victim S.W. reviewed his/her Mastercard statement from August 2023 and highlighted one fraudulent charge he/she did not authorize.  This charge totaled approximately $4,818.

c.    S.W. stated he/she does not know anyone by the name BUCHANAN and did not authorize BUCHANA to use his/her credit card.

d.    SAs showed S.W. multiple photographs of BUCHANAN and a co-conspirator in various stores in Southern California as well as their California Department of Motor Vehicle photographs. S.W. did not recognize BUCHANAN or the co-conspirator in any of the pictures.

e.    SAs contacted victim S.W.'s daughter, W.W. and asked W.W. if she authorized anyone to use the 2699 card and

W.W. did not. W.W. said she noticed the transaction and called S.W. to verify if S.W. used the card at Neiman Marcus. S.W. told W.W. she did not use the card and immediately after the phone call, W.W. contacted the credit card company to report the fraudulent transaction.

### J.   LA County Probation Confirms BUCHANAN is still using the 9890 Number

20. On or about May 22, 2024, I contacted the Los Angeles County Probation Department ("LACPD") and confirmed that BUCHANAN has been on probation since as early as December 29, 2021, and will remain on probation until March 5, 2026. Additionally, the 9890 Number that BUCHANAN provided to law enforcement is listed as BUCHANAN's contact telephone number with LACPD.

21. On or about May 28, 2024, an officer with LACPD called the above telephone number and confirmed that BUCHANAN was the individual that answered the phone call.

### K.   Verizon Wireless Provides Subscriber Information

22. On July 10, 2024, Verizon Wireless provided subscriber information for the 9890 Number. The Subscriber on the account is listed as BUCHANAN and account information reveals BUCHANAN reactivated the same phone number on August 25, 2023.

### L.   Federal Warrant Issued for BUCHANAN's Cellular Telephone Location Information

23. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, on August 7, 2024, U.S. Magistrate Judge Jaqueline Chooljian issued search warrant

number 2:24-mj-4741, for historical and prospective cell site information for the 9890 Number, subscribed to BUCHANAN. HSI Agents conducted a review of location information and found that the 9890 Number visited multiple areas known to have high-end retail stores. Location data also consistently pinged overnight in an apartment complex area in Canoga Park, California.

### M. Surveillance of BUCHANAN Places BUCHANAN at the SUBJECT PREMISES and driving the SUBJECT VEHICLE

24. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

a. On August 12, 2024, at approximately 1:06 p.m., cellular location data of the phone subscribed to BUCHANAN started to ping in the vicinity of Rodeo Drive in Beverly Hills, California. SAs initiated surveillance on Rodeo Drive in an effort to locate BUCHANAN. Rodeo Drive is known for its collection of high-end designer and boutique shops. SAs were unable to find BUCHANAN at this location but continued surveillance based on cellular location information being transmitted every fifteen minutes.

b. SAs initiated surveillance near 12028 Vose Street in North Hollywood, California and based on law enforcement reports this location is known to be a music studio BUCHANAN frequents. SAs saw a dark colored Audi Q7 SUV vehicle, bearing paper plates CG41H43 (i.e., the **SUBJECT VEHICLE**), parked outside the studio and parked facing east on Vose Street.

c.   SAs saw two white signs posted outside the building. One of the signs displayed "Bills Place" and the other "Frankie's Hideaway." A review of open-source websites showed that Frankie's Hideaway is listed as a music studio.

d.   At approximately 4:32 p.m., agents saw BUCHANAN exit the studio, enter the **SUBJECT VEHICLE**, and travel to a Shell gas station in North Hollywood, California.

e.   At approximately 4:41 PM, HSI agents received updated location data for BUCHANAN's cellular telephone and found that it was located near the intersection of the Shell gas station.

f.   At approximately 4:48 p.m., SAs saw BUCHANAN exit the back seat of the **SUBJECT VEHICLE** parked next to a fuel pump at the Shell gas station. BUCHANAN looked around the gas station parking lot, entered the store, and returned to the **SUBJECT VEHICLE** before departing.

g.   Based on a review of location data, HSI agents determined BUCHANAN spends most of his evenings and overnight near 6701 Eton Ave., Apartment 515, Canoga Park, California (i.e., the **SUBJECT PREMISES**). I reviewed location data for the date range of August 9, 2023 through August 25, 2024 and observed that the 9890 Number returned to the **SUBJECT PREMISES** on a nightly basis.

h.   On August 12, 2024, at approximately 6:49 p.m., SAs observed the **SUBJECT VEHICLE** entering the parking garage of the **SUBJECT PREMISES**. SAs saw BUCHANAN exit the **SUBJECT VEHICLE**, retrieve grocery bags, and walk into apartment 515.

25. BUCHANAN provided the **SUBJECT PREMISES** address as his home address to VCSO officers when he was arrested on August 3, 2023. I also checked the Accurint database and observed that the **SUBJECT PREMISES** is associated with BUCHANAN.

26. On August 23, 2024, a leasing office representative at 6701 Eton Avenue told an HSI SA that BUCHANAN is the only individual on the lease at the **SUBJECT PREMISES.**

## V.    TRAINING AND EXPERIENCE REGARDING FRAUD OFFENSES

27.  Based on my training, experience, and consultation with other law enforcement officers, I am aware of the following:

a.    Individuals involved in fraud schemes usually keep evidence of their schemes, such as pay-owe sheets for dividing the proceeds, contact information for their co-conspirators, and records documenting the scheme so if an error is made, they can recreate the documentation needed to help conceal the fraud.

b.    These individuals often use the proceeds of the fraud to purchase expensive items, or store the proceeds in the form of cash to make it more difficult to trace.

c.    Individuals involved in fraud schemes need to communicate with their co-schemers about their fraudulent activity.  There are usually records of those communications in their electronic devices such as cellular telephones.

d.    Typically, they maintain the evidence where it is close at hand and safe, such as in their residences, vehicles, and digital devices, which are also commonly stored in their

residences and vehicles.  Such individuals commonly use digital
devices to communicate with their fellow participants by phone,
email and text messages.  I know that individuals who commit
crimes with the aid of electronic devices do not readily discard
them, as computers, tablets, and cell phones as they are
expensive items that are typically used for years before being
upgraded or discarded.  Computers, tablets, and cell phones can
be used to communicate between co-conspirators and may contain
information relating to the crime under investigation.

      e.    I know from training and experience that
individuals involved in fraud keep the most damaging evidence
and/or proceeds of the scheme at their residences, vehicles,
garages and to help conceal the fraud from their fellow
coworkers who may have access to such documents at the
workplace.  Proceeds such as cash and gifts are easier to
conceal at the fraudster's residence rather than in plain view
of coworkers.  I also know that fraudsters will often hide
disposable "burner" phones and other digital devices used to
communicate with co-conspirators in locations other than their
residences to further avoid detection from law enforcement.

      f.    American Express National Bank ("American
Express") is a financial institution insured by the Federal
Deposit Insurance Corporation.  American Express administers
credit card accounts, in that American Express extends credit to
account holders to pay for purchases and American Express pays
the merchant on the account holder's behalf.

g.   Individuals who commit fraud often use luxury vehicles such as Maseratis and Audis to gain access to exclusive areas and to maintain an image of wealth in order to perpetuate their fraud.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

28. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, email, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

30. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BUCHANAN's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of BUCHANAN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

31.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>CONCLUSION</u>

32. For all the reasons described above, there is probable cause to believe that BUCHANAN has violated 18 U.S.C. § 1344(2) (Bank Fraud).

33. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the **SUBJECT PREMISES**, as described in Attachment A-1, on the person, including digital devices, of BUCHANAN, as described in Attachment A-2, and the **SUBJECT VEHICLE** as described in Attachment A-3.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 26th day of August, 2024.

_____
HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE